No. 68,379

DAVID HURLBUT, *Appellee*, v. CONOCO, INC., *Appellant/Cross-Appellee*, and FIRMAN L. CARSWELL MANUFACTURING COMPANY, *Appellee/Cross-Appellant*.

(856 P.2d 1313)

Opinion filed July 30, 1993.

*Lynn W. Hursh,* of Armstrong, Teasdale, Schlafly & Davis, of Kansas City, argued the cause, and *John A. Vering III, Gerald A. King,* and *Renana B. Abrams,* of the same firm, were with him on the briefs for appellant/cross-appellee.

*Ben T. Schmitt,* of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Overland Park, argued the cause, and *Paul Hasty, Jr.,* of the same firm, was with him on the brief for appellee/cross-appellant Firman L. Carswell Manufacturing Company.

*Lynn R. Johnson,* of Shamberg, Johnson, Bergman & Morris, Chartered, of Overland Park, argued the cause, and *Thomas E. Hayes* and *John E. Shamberg,* of the same firm, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: This is an appeal from a jury verdict in a personal injury action in favor of plaintiff, David Hurlbut, against his employer, J & J Metal Products Company (J & J), and Conoco, Inc., for injuries suffered as a result of an explosion at the J & J plant. The jury unanimously awarded Hurlbut $14,613,553 and apportioned fault 85% against Conoco, 15% against J & J, and 0% against the other parties. Judgment was entered against Conoco and in favor of Hurlbut in the amount of $12,421,520 (85% of the jury verdict). Conoco appeals, claiming the trial court (1) erred in failing to grant its motions for summary judgment, directed verdict, and judgment notwithstanding the verdict and (2) deprived it of its right to a fair trial. Defendant Firman L. Carswell Manufacturing Company (Carswell), the maker of the vat which exploded, cross-appeals.

Hurlbut was severely injured as a result of an explosion on January 20, 1988, at the J & J plant in Paola, Kansas. Hurlbut was an employee of the company. Two other employees, Charles Hoffman and John Windisch, died as a result of their injuries from the explosion. Wrongful death actions involving those decedents were consolidated with the Hurlbut lawsuit for discovery and trial. This appeal is not concerned with the verdict and judgment in those actions, which have been settled.

J & J manufactures and markets corrugated steel pipes. As part of its manufacturing operations, J & J uses a large asphalt dip vat for the purpose of coating corrugated steel pipe with asphalt. Carswell designed, manufactured, and installed the dip vat used by J & J in 1951 or 1952. The dip vat had an open-to-air asphalt chamber, or pan, sitting on top of a heat transfer oil chamber. Ten natural gas burners heated oil in the lower chamber which in turn heated asphalt in the upper chamber. J & J had always used Dowtherm A in the lower chamber. The Dowtherm A was heated to its boiling point of 490 degrees Fahrenheit during the heat transfer process.

Dowtherm A (manufactured and marketed by Dow Chemical Company) was designed to be utilized either as a liquid phase heat transfer medium or a vapor phase heat transfer medium. Carswell recommended Dowtherm A for use as a vapor phase heat transfer medium in the vapor phase heat transfer system of

the dip vat. From 1951 until January 1988, Dowtherm A functioned safely and effectively as a vapor phase heat transfer medium in the vapor phase heat transfer system of the dip vat. In January 1988, J & J substituted Conoco heat transfer oil (CHTO) for Dowtherm A as the heat transfer medium in the dip vat. CHTO is designed as a liquid phase only heat transfer medium to be used only in liquid phase heat transfer systems. CHTO is not designed for use as a vapor phase heat transfer medium in any type of vapor phase heat transfer system. J & J, acting on Conoco's recommendation, attempted to use CHTO in the same manner as Dowtherm A had been used.

J & J performed routine maintenance on the dip vat in December 1987 and January 1988. Part of the routine maintenance included replacing the heat transfer fluid. During the routine maintenance of the dip vat in January 1988, Dowtherm A was drained from the heat transfer chamber and replaced with CHTO. In order to remove any residual Dowtherm A from the heat transfer chamber, J & J employees put water into the chamber, heated the water until it boiled, and then drained the water and Dowtherm A residue from the heat transfer chamber.

After replacing the Dowtherm A with CHTO, J & J employees started the process of heating the asphalt dip vat during the afternoon of January 19, 1988. In order to gradually heat the transfer system, the dip vat, and the asphalt, the burners were ignited over a period of time. Throughout the night and early morning of January 19-20, 1988, one or more of J & J's employees stayed with the dip vat and observed the heating process.

At approximately 4:20 p.m. on January 20, 1988, an explosion forced the bottom of the asphalt chamber of the dip vat upwards into an inverted position. Asphalt was spewed throughout the dip house. A fireball erupted and also spread throughout the house. There were only two possible scientific explanations for the explosion: (1) autoignition of the heat transfer oil; or (2) water instantaneously flashing to steam.

Hurlbut sued Conoco; Carswell; J & J; Quality 66 Service Company, the company that sold the heat transfer oil to J & J; and others. Trial commenced on March 2, 1992, and ended April 24, 1992. The jury found Conoco liable for breach of express warranty, strict liability, breach of implied warranty, negligence,

and misrepresentation of material facts. The jury found the cause of the explosion in the heat transfer chamber of the asphalt dip vat to be autoignition.

## MOTION FOR SUMMARY JUDGMENT

Conoco first contends its motion for summary judgment should have been granted because: (a) plaintiff was allowed to violate Supreme Court Rule 141 (1992 Kan. Ct. R. Annot. 124) by reserving until the trial the right to call witnesses to controvert defendant's facts set out in its motion for summary judgment; (b) plaintiff did not and could not produce facts in support of the autoignition theory; and (c) the facts contained in the summary judgment record demonstrated that steam caused the explosion.

Conoco's motion for summary judgment and memorandum in support of the motion were filed on December 16, 1991. Plaintiff's memorandum in opposition set out 295 uncontroverted facts. At the conclusion of the hearing on Conoco's motion for summary judgment, the judge refused to grant the motion because he would be required to weigh the evidence to rule on the motion. He stated:

"I don't think there are sufficient uncontroverted Findings of Fact with which to sustain a total motion for summary judgment for Conoco in this particular case on that motion."

The order of the trial court denying the motion for summary judgment was filed on February 27, 1992. The order merely stated that Conoco's motion for summary judgment was denied.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Mark Twain Kansas City Bank v. Kroh Bros. Dev. Co.*, 250 Kan. 754, 762, 829 P.2d 907 (1992).

Summary judgment may be granted when the evidence shows no liability as a matter of law and where the central facts are not in dispute. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. An issue of fact is not genuine

unless it has legal controlling force as to a controlling issue. A disputed question of fact which is immaterial to the issue does not preclude summary judgment. If the disputed fact could not affect the judgment, it does not present a genuine issue of material fact. *Knudsen v. Kansas Gas & Electric Co.*, 248 Kan. 469, 483, 807 P.2d 71 (1991).

The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. On appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. The party opposing summary judgment, however, has the affirmative duty to come forward with facts to support its claim, although it is not required to prove its case. If factual issues do exist, they must be material to the case to preclude summary judgment. *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 306-07, 756 P.2d 416 (1988).

### VIOLATIONS OF SUPREME COURT RULE 141

Conoco contends the trial court violated Supreme Court Rule 141 by allowing the plaintiff to wait until the trial to call witnesses to controvert the factual bases for Conoco's motion for summary judgment. In addition, Conoco asserts plaintiff's memorandum in opposition to summary judgment failed to set forth its facts and contentions, a concise summary of conflicting testimony or evidence, and proper citations to the record.

In its brief, Conoco has not pointed out any portion of the record to support its contention that the trial court allowed Hurlbut to call witnesses during the trial to present additional evidence controverting the factual bases of Conoco's motion for summary judgment. We have reviewed the pleadings and note the order denying defendants' motion for summary judgment was filed prior to trial. The fact that the defendants' motion for summary judgment was denied prior to trial shows that the trial court did not violate Supreme Court Rule 141 by allowing plaintiff to wait until trial to call witnesses to controvert the motion for summary judgment.

## FACTS SUPPORT A STEAM EXPLOSION,
## NOT AUTOIGNITION

Conoco next contends that it is entitled to summary judgment because plaintiff failed to present evidence prior to trial that Conoco's product, CHTO, was the probable cause of plaintiff's injuries. Conoco is arguing that, in order for the plaintiff to successfully oppose its motion for summary judgment, plaintiff had to prove that CHTO probably caused his injuries by autoigniting. Conoco claims the plaintiff failed because plaintiff's experts merely assumed the existence of the two necessary conditions for autoignition of the CHTO, *viz.*, (1) that a sufficient quantity of oxygen was present in the heat transfer chamber of the asphalt dip vat when (2) the temperature of the CHTO exceeded its autoignition temperature of 680 degrees Fahrenheit. Conoco claims that, although plaintiff's memorandum in opposition to Conoco's motion for summary judgment contained 295 statements of uncontroverted facts, the memorandum did not set out the facts or calculations upon which plaintiff's experts relied to prove the factors necessary for autoignition of the CHTO. Conoco concludes that the uncontroverted facts contained in the summary judgment record show that the cause of the explosion was steam, not autoignition of the CHTO.

Plaintiff responds that he did not have to prove that autoignition of the CHTO caused the explosion. He claims that the theories of recovery against Conoco, set forth in the pretrial order, did not require proof of the exact scientific explanation or cause of the explosion. Those theories were: (1) breach of express warranty; (2) breach of implied warranty of fitness for a particular purpose; (3) strict liability pursuant to Restatement (Second) of Torts § 402B (1963) (misrepresentation of material facts about the character, quality, and suitability of CHTO); (4) negligence; and (5) strict liability pursuant to Restatement (Second) of Torts § 402A (1963) (unreasonably dangerous and defective in design and because of inadequate warnings and instructions). Plaintiff argues that whether the explosion was caused by steam or by autoignition of CHTO was not essential to his theories of liability. If the record supports the jury's finding that the CHTO autoignited, we need not reach this argument.

Was the district judge correct in finding there were sufficient facts to allow the jury to determine if the CHTO autoignited? We note the record shows Dowtherm A, a man-made product, has a fixed boiling point and cannot be heated to a temperature where it will autoignite. CHTO is a petroleum based product which has a boiling range. Once CHTO reaches its initial boiling temperature, certain percentages of it begin to vaporize and it will continue until it is all vaporized. Complete vaporization occurs at around 1,000 degrees Fahrenheit. Conoco engineers admitted that when CHTO's temperature exceeds 680 degrees Fahrenheit and oxygen is present, CHTO will autoignite without a flame source.

In a vapor phase heat transfer system, the temperature at the surface of the CHTO has to be significantly greater than the asphalt it was heating in the vat. Both of plaintiffs' experts determined that at 4:20 p.m. on January 20, 1988, when the explosion occurred the temperature of the CHTO vapors was in excess of the oil's autoignition temperature of 680 degrees Fahrenheit, and the explosion was caused by autoignition of CHTO vapors.

Plaintiff claims its memorandum contained uncontroverted facts that at the time of the explosion the temperature of the CHTO exceeded 680 degrees Fahrenheit and that oxygen was present in the system. In addition, its memorandum set out a variety of ways that oxygen could have entered the system prior to the explosion. The most plausible explanation was that on the day of the explosion, J & J employees shut down the vat's burner system before quitting for the day. Turning down the burners caused a decrease in the temperature inside the heat transfer chamber, resulting in a reduction in pressure. Reducing the pressure sucked oxygen into one or both of the two valves that were opened during the shutdown procedure. Oxygen entering the heat transfer system when the CHTO was at or above its autoignition temperature caused the explosion of the asphalt dip vat.

Evidence of J & J's normal shutdown procedure supported plaintiff's experts' opinions on how the oxygen entered the heat transfer chamber of the asphalt dip vat. The procedure at the time the burners were being shut down was first to drain the condensation tank on the west end of the vat, then open the

faucet-like valve, thereby permitting the heat transfer chamber to be refueled with condensed heat transfer fluid. The opening of the faucet-like valve provided an opening for oxygen to be sucked into the system.

Plaintiff states there was evidence that it was scientifically impossible for liquid water or steam to have been present in the heat transfer chamber at the time of the explosion. The heat transfer chamber had been continuously vented the night before the explosion. Because the temperature of the CHTO was significantly above its initial boiling point of 600-750 degrees Fahrenheit by 7:00 a.m. on January 20, 1988, all of the water had to have been vaporized and vented out the open valve the night before the explosion. Without water or steam present, therefore, steam could not have caused the explosion.

In addition, one of plaintiff's experts in mechanical engineering noted that the amount of volume displacement of the heat transfer chamber of the dip vat after the explosion was approximately 500 cubic feet. The volume displacement if caused by a steam rupture would have been approximately 40 cubic feet. Because the increase in volume of the heat transfer chamber was 500 cubic feet, plaintiff's expert concluded it was impossible for the explosion to have been caused by steam.

The burden on the party seeking summary judgment is a strict one. The trial court resolved all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling was sought. On appeal, we have applied the same rule and find reasonable minds could differ as to the conclusions drawn from the evidence. Under the applicable standard of review, the district court was correct in refusing to grant summary judgment to Conoco.

## MOTIONS FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT

Conoco next contends that the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict because: (a) plaintiff relied on speculation, false assumptions, and conjecture to support his autoignition theory; (b) plaintiff's own evidence demonstrated that it was impossible for autoignition to have caused the explosion; and (c) the evidence

at trial demonstrated that steam, not autoignition, caused the explosion.

When a verdict is challenged for insufficiency of the evidence or as being contrary to the evidence, it is not the function of this court to weigh the evidence or pass on the credibility of the witnesses. *Wisker v. Hart,* 244 Kan. 36, 37, 766 P.2d 168 (1988). In ruling on a motion for directed verdict pursuant to K.S.A. 1992 Supp. 60-250, the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought and, where reasonable minds could reach different conclusions based on the evidence, the motion must be denied and the matter submitted to the jury. This rule must also be applied when appellate review is sought on a motion for directed verdict. The same test is applicable to a motion for judgment notwithstanding the verdict. *Simon v. National Farmers Organization, Inc.,* 250 Kan. 676, 683, 829 P.2d 884 (1992).

Plaintiff notes that there were only two theories on the cause of the explosion, autoignition of CHTO or steam. Citing *Farmers Ins. Co. v. Smith,* 219 Kan. 680, 549 P.2d 1026 (1976), and its citation of *Casey v. Phillips Pipeline Co.,* 199 Kan. 538, 431 P.2d 518 (1967), plaintiff points out that causation of the explosion may be proven by circumstantial evidence. In *Farmers Ins. Co.,* this court noted that plaintiff's expert stated that he looked for all of the possibilities that could start a fire and then, by the process of elimination, went through the complete checklist of possibilities to arrive at his opinion as to the source of ignition and the source of combustion in that fire. The *Farmers* court noted that a cause of action may be proven by circumstantial evidence, and such evidence, in order to be sufficient to sustain a verdict of a jury, need not rise to that degree of certainty which will exclude any and every other reasonable conclusion. The court found that proximate causation in a proper case may be shown by circumstantial evidence. By plaintiff's expert's elimination of other possible causes for the fire, his conclusion that the fire was the result of some defect in the mobile home's electrical system was reasonable. 219 Kan. at 686-90.

In denying Conoco's motion for a judgment notwithstanding the verdict, the trial court stated:

"Conoco, in its motion, argues unpersuasively, that the court and the jury should have ignored all of the evidence offered by the plaintiff's experts on the cause of the explosion and in its stead listened only to the defendant's experts who testified the cause of the explosion was steam and therefore the fault of J&J. They also argue that the plaintiff's experts were not qualified to testify and therefore their testimony was inadmissible and therefore the plaintiffs failed to present a *prima facie* case.

"Conoco argues that Dr. Lee Lowery and Dr. George Peterson were not qualified and therefore should not have been permitted to testify. Many of the citations to testimony concerning Lowery and Peterson are to depositions taken prior to trial or allegations of fact made by Conoco in its motion for summary judgment filed prior to trial. In dealing with this motion the court is more concerned about what evidence was presented at trial.

### DR. GEORGE PETERSON

"The court for the sake of brevity, will not repeat here the extensive curriculum vitae of Dr. Peterson that was admitted into evidence at trial as plaintiffs' exhibit no. 293. Suffice it to say, Dr. Peterson has devoted a large portion of his life, his education, his research, his teaching, his writings to the phenomenon of heat transfer, especially that which occurs when substances change phase, that is from a solid to a liquid, and from a liquid to a vapor. He demonstrated in court an ability to perform thermodynamic calculations that clearly and unrefutably are not within the skills of ordinary citizens. The man is an expert in this field and has many accomplishments.

"Furthermore, it is not surprising that Dr. Peterson has not done extensive work with petroleum products since they *by their very nature* are so unsuitable as heat transfer mediums in vapor phase heat transfer systems. But that fact does not make him "unqualified" to testify about how the heat transfer system of the asphalt dip vat at J&J worked and how thermodynamically it exploded. His expertise goes to the very heart of the issue. Conoco would have this court believe that only an expert on petroleum products or on dip vats could testify. They miss the point. Dr. Peterson could clearly, through the application of his expertise, determine and testify about this explosion and how it occurred on a level that few other witnesses could.

### DR. LEE LOWERY JR.

"At trial, plaintiffs' exhibit 281 contained extensive information about Dr. Lowery. It will not be repeated here. Summarily, it can be said that the education, experience and training of Dr. Lowery leads this court to the conclusion that he is an expert in the field of structure failure analysis, structure design and analysis and mechanical device design and analysis. Further, he is able to determine these matters in a fashion that is not common to mankind in general.

"It was also determined that Dr. Lowery had extensive knowledge, experience and training in the subject of engineering ethics, and standards by which product designers are or should be professionally judged.

"The areas of engineering in which any rational court would conclude Dr. Lowery is an expert were material to the issues of this case and were clearly helpful to the jury in determining if Conoco Heat Transfer Oil, as a product itself, should have been introduced into the heat transfer system of the asphalt dip vat at J&J. This should not overlook the fact that his testimony about the structure of the dip vat itself was important in the determination of the issues presented in this case.

"These two men presented testimony to the jury about engineering principles, thermodynamics, mechanisms of heat transfer, design and safety considerations, mathematical computations of heat production, vapor pressure, explosions and metal deformation and destruction, and volumetric calculations. These learned witnesses displayed a comprehensive knowledge of these topics as well as others that are outside the scope of knowledge of mankind in general. These technical subjects are certainly proper for expert testimony. [Citation omitted.]

"The arguments made by Conoco attempt to show that since those two experts testified that the recommendation and use of Conoco Heat Transfer Oil in the heat transfer chamber of the asphalt dip vat at J&J was unsafe and improper their conclusions are wrong and inadmissible because their testimony tends to show fault on the part of Conoco. In other words, if their testimony is damaging to Conoco's case, it is wrong and inadmissible.

"But the jury was able to hear, evaluate and judge the testimony of these two men in contrast to the testimony of the experts of Conoco. The jury was persuaded by the former.

"Conoco makes much of the fact that these two experts were relying upon reports of others and upon some scientific principles, such as, autoignition of petroleum products can only occur in the presence of oxygen. It is clear to this court that the plaintiffs' experts were relying upon the same physical evidence and reports of the explosion investigators as the experts of Conoco. Further they made physical inspections of the remains of the vat along with measurements and scientific tests. Further, the scientific principle about autoignition was agreed to by Conoco's experts. They reached different conclusions and demonstrated them to the jury. The jury chose to believe the plaintiffs' experts over the defendants'.

"Finally, much is made by Conoco that David Hurlbut testified that he heard the burners burning when he entered the dip vat house on that fateful day. He also testified that he had his hard hat on and had his back to the vat just before the explosion. He also testified that he was looking at his watch and thinking about quitting and saying 'it was time to pick up the tools.' Does this mean all the burners were on and burning? Does this mean that Hoffman or Windisch was not in the process of shutting the burners off when he entered? Does this mean there was no leak around one of the tubes? Does this mean that a partial vacuum would not be created when the burners were turned off therefore drawing air (and therefore oxygen) into the heat transfer chamber through one or all of the valves that were open? Or through the leak? Mr. Hurlbut testified about what he

thought he heard. The jury then weighed the evidence and concluded that oxygen had entered the heat transfer chamber in sufficient quantities [to] produce the autoignition explosion."

Expert opinion testimony is admissible if it will be of special help to the jury on technical subjects with which the jury is not familiar or if such testimony will assist the jury in arriving at a reasonable factual conclusion from the evidence. The test of competency of an expert witness is whether he or she discloses sufficient knowledge to entitle his or her opinion to go to the jury. The admissibility of expert testimony is within the broad discretion of the trial court. *Wahwasuck v. Kansas Power & Light Co.,* 250 Kan. 606, Syl. ¶¶ 3, 4, and 5, 828 P.2d 923 (1992).

As noted, the burden on the party seeking a directed verdict and a judgment notwithstanding the verdict is a strict one. Here, the trial court resolved all the facts and inferences which could have reasonably been drawn from the evidence in favor of the prevailing party. Applying the same rule on appeal, we find reasonable minds could differ as to the conclusions requested by the defendant and, therefore, the trial court properly denied the defendant's motions for a directed verdict and a judgment notwithstanding the verdict.

## DEPRIVED OF A FAIR TRIAL

Conoco asserts it is entitled to a new trial because the trial court: (a) allowed plaintiff's experts to change their opinions and calculations prior to and during trial; (b) allowed into evidence a brochure produced by defendant Carswell in the middle of trial; and (c) refused to allow Conoco to demonstrate to the jury the kettle test which illustrated the scientific principles applicable to steam explosions. In reviewing these claims, we note that the granting of a new trial is a matter of trial court discretion and, as with all discretionary matters, will not be disturbed on appeal except by a showing of abuse of that discretion. *State v. Brown,* 249 Kan. 698, Syl. ¶ 1, 823 P.2d 190 (1991); *State v. Anderson,* 211 Kan. 148, 150, 505 P.2d 691 (1973).

On February 25, 1992, approximately six days prior to the start of trial, plaintiff delivered to Conoco's attorneys additional reports prepared by Dr. Peterson. The next day, Conoco filed a motion in limine to exclude the new calculations and to preclude Dr.

Peterson from testifying at trial as to these calculations or for the court to grant a continuance so that it could analyze and prepare a defense against the new calculations. On February 28, 1992, the trial court denied both motions because the trial had been set for over a year, the court did not know when it could be reset, and the court budget had been prepared for the trial to be held in 1992. The judge stated that he understood why Conoco felt surprised by Dr. Peterson's new calculations but that plaintiff's counsel had not attempted to conceal the information and the judge was satisfied that the information was promptly forwarded to Conoco's counsel by the plaintiff's attorney upon its receipt. However, the trial court stated Conoco could depose Dr. Peterson over that information if Conoco desired

"since this does appear to be much different than at least the portions of the deposition that he previously gave, and if Conoco feels that in their turn of presenting evidence in this case they need to hire someone to rebut that, they may do so, but they should notify this Court and the plaintiffs of who that person is by the 15th of March."

Plaintiff asserts it is important to note that at the time of Dr. Peterson's deposition, Conoco had not provided plaintiff all of the information required by Dr. Peterson to finalize all of his opinions. Dr. Peterson's additional calculations were a result of subsequent calculations by Conoco's expert, Dr. Burmeister. Plaintiff argues that Dr. Peterson's new calculations did not change his ultimate opinions but merely rebutted Dr. Burmeister's most recent calculations.

We note that Dr. Burmeister's deposition was taken on January 14, 17, and 20, and concluded on February 13 and 14, 1992. Dr. Burmeister's deposition totaled 847 pages, and included 75 exhibits, containing mostly calculations. During Dr. Burmeister's deposition of February 13 and 14, 1992, he provided additional calculations and opinions that had been previously unknown to plaintiffs. Plaintiffs sent all of the information gathered in the January and February 1992 depositions of Dr. Burmeister to Dr. Peterson and Dr. Lowery. All of Dr. Peterson's calculations to which Conoco objected on the grounds they were new were responses to the opinions, calculations, and evidence from Dr. Burmeister's depositions. This claim has no merit.

## EXPERTS CHANGING TESTIMONY

Prior to trial, when Conoco had asked the court to·set a deadline for plaintiff's experts to complete their calculations,·the trial court noted:

"Counsel, there is only so much I can do, but it seems like to me that these experts are going to be the type that they are going to continually make recalculations. They will be feeding off of one another, if you will. They will hear what the other person says and say, 'I didn't think of that. Let me do this.' They will be talking to you back and forth, and they will probably be making new calculations after the trial, because there are things that you probably haven't thought to tell me that they didn't think to ask you.

"I don't think it is realistic. I think they are going to continue to do this—I will tell you this: If there is any change—major change in their testimony and they notify you of that, then you are going to have to notify the other side. I can't believe that they would change anything in a major way, but these minor refinements, I think that is just going to be the nature of their field. I can't give you that, so I won't order that."

K.S.A. 60-456(b) provides, in part:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing . . . ."

Throughout discovery and trial, the court is vested with vast amounts of discretion in· its direction of the pretrial discovery and the admission of evidence during the trial. Judicial discretion implies the liberty to act as a judge should act, applying the rules and analogies of the law to the facts and situations which occur prior to and during the trial.

Experts for both sides were allowed to submit calculations during trial to rebut testimony. Throughout trial, defendant's experts changed their testimony about their calculations and·revealed new data about CHTO. As a result, plaintiff's experts repeated previous calculations or performed new ones to respond to the new testimony and calculations of defendant's experts. We have reviewed the defendant's claim and find that reasonable persons could differ as to the propriety taken by the trial court; therefore, it cannot be said that the trial court abused its discretion.

## CARSWELL BROCHURE AND DOCUMENTS

On March 25, 1992, three weeks into trial, ·during cross-ex-

amination of Richard Schmidt, president of codefendant Carswell, Conoco's counsel asked Schmidt if he could obtain information concerning a reference his father, past president of Carswell, had made about an asphalt vat and a Dow representative. Schmidt agreed to look for the requested information that night. Schmidt found the information stored in a box in the basement of the manufacturer's office.

On March 26, 1992, Schmidt produced the advertising brochure describing the asphalt dip vat as using the vapor phase heating process and three pieces of correspondence indicating that Carswell was ordering the correct amount of Dowtherm heat transfer liquid. These documents would have been covered by Conoco's request for production of documents in July 1990. On March 27, 1992, Conoco filed its objections to the introduction of these documents into evidence, requesting a mistrial or a three-month continuance. The trial court refused to grant a mistrial or a three-month continuance and admitted the documents into evidence. To allow Conoco time to assess its position and the parties to recall witnesses, reinstate claims against Carswell, and conduct additional discovery, the judge recessed the trial for four days.

Conoco contends it did not receive a fair trial because the hearsay brochure and other documents admitted in the middle of the trial not only surprised Conoco, they destroyed Conoco's trial strategy and the credibility of its experts and counsel. Conoco's first assertion is that the documents were inadmissible out-of-court hearsay statements offered by the plaintiff to prove that the vat was designed as a vapor phase system. Conoco argues these documents were found in the "private" file of Mr. Lagerwall, a deceased former employee of Carswell, and were not kept in the ordinary course of business. Conoco claims the exhibits were untrustworthy because the author of the brochure was unknown and there was no opportunity to cross-examine the author or authors as to the validity or accuracy of the documents.

Plaintiff claims the exhibits also were properly admitted as business records under K.S.A. 1992 Supp. 60-460(m), which allows admission of:

"(m) *Business entries and the like.* Writings offered as memoranda or records of acts, conditions or events to prove the facts stated therein, if the judge finds that (1) they were made in the regular course of a business at

or about the time of the act, condition or event recorded and (2) the sources of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness.

"If the procedure specified by subsection (b) of K.S.A. 1992 Supp. 60-245a for providing business records has been complied with and no party has required the personal attendance of a custodian of the records or the production of the original records, the affidavit of the custodian shall be prima facie evidence that the records satisfy the requirements of this subsection."

We note that the letters were addressed to or sent by an employee of Carswell at the time and they were retained in the employee's letter file which remained at the Carswell plant. The president of Carswell testified that these were business letters prepared at or near the dates on the letters and all related to Carswell's business.

The admissibility of business records is a question to be determined by the trial court upon a preliminary showing as to their authenticity and accuracy. The judge's determination of the sufficiency of such preliminary proof will not be disturbed unless there has been an abuse of discretion. An appellate tribunal will accept the trial judge's assessment unless the judge's assessment was arbitrary or capricious. The trial judge did not abuse his discretion in admitting the documents.

Conoco next asserts that the prejudice and surprise caused by the admission of the exhibits disrupted Conoco's trial strategy and destroyed Conoco's experts' and counsel's credibility. In addition, Conoco alleges plaintiff's counsel used the brochure to bolster plaintiff's experts' credibility. Conoco states that although it was permitted to make new allegations of fault against Carswell admission of the documents made it impossible to communicate a new defense to the jury.

Before admitting the documents, the trial court noted:

"As a result of cross examination by Conoco's trial counsel, Mr. Schmidt, who was testifying on behalf of defendant Firman Carswell Manufacturing Co., was asked to find the name of a representative of Dow Chemical Co. with whom he had dealings years ago. During an evening recess, Mr. Schmidt went through some papers in an old box behind a furnace in a storage room at Firman Carswell's plant in Kansas City, Ks. He found Firman Carswell Exhibits 7 and 8. Outside the presence of the jury, the court examined the documents in question and sent the jury home so that the parties could have an opportunity to brief the court on the effect of the

admission of these documents into evidence and whether they should be admitted into evidence. This court is convinced that Mr. Schmidt was telling the truth and he had found these exhibits and there is no evidence to believe that he or his counsel tried to hide their existence from the Court or the other parties. The man simply found the exhibits that were relevant and material and competent to prove some points that were in dispute during the trial.

"After adjourning court for a day, the Court then held a hearing outside the presence of the jury to determine the admissibility of the exhibits and determine the progress of the trial thereafter.

"Although no one knew of the existence of these and there was legitimate surprise about the documents Conoco argued at the time that their statements are not relevant or material to their defenses. They argued throughout the trial that it was irrelevant whether the heat transfer system in the asphalt dip vat at J&J was designed as a vapor phase or liquid phase system. It was their position that it was operated as a liquid phase system by J&J and that was important, not its design. Conoco continued with great vigor to allege fault on the part of J&J for using water to flush out this system. This was the core of Conoco's defense.

"These documents shed significant light on matters that until their admission, had been disputed by the parties. Those issues were: 1. When and by whom was the dip vat designed? 2. Was it a vapor phase or liquid phase design? and 3. What was its operating pressure and temperature? These documents corroborated other evidence previously admitted by both the plaintiffs and Conoco on these points. None of the information in these documents precluded Conoco from its defense.

"After determining that the documents should be admitted into evidence, the court then granted a four day adjournment of the trial, not six months as requested by Conoco. [In its brief, Conoco states it requested a three-month continuance.] Whatever surprise or shock Conoco experienced as a result of these documents being unearthed during the trial they had sufficient time to overcome them, especially since it was several weeks before Conoco had to present evidence. Also the court granted leave to Conoco to review their claims of fault against Firman Carswell and make new ones as well.

"The court will not restate its findings about these documents or Conoco's request for a mistrial made in the course of the trial but will, rather, incorporate them as if fully set out herein.

"Suffice it to say the court does not believe that it committed error when it made the judgments mentioned above."

K.S.A. 60-445 provides:

"Except as in this article otherwise provided, the judge may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered."

Citing 1 Gard, Kansas C. Civ. Proc. 2d Annot., § 60-445 (1979), plaintiff argues that the exclusion of evidence on grounds of unfair surprise is not favored in Kansas. Plaintiff argues that Conoco cannot show that it suffered unfair prejudice as a result of the admission because Conoco had, in its opening statement, clearly stated to the jury that it did not matter whether the vat had a liquid or vapor phase system.

The existence of the brochure and other documents was no longer known by Carswell—time had even extinguished Carswell's knowledge that it had manufactured the vat. Conoco had not anticipated that its cross-examination of the now president of Carswell would lead to the discovery of documents.

The trial judge recognized that not only Conoco but all the parties were surprised by the discovery. The trial judge determined the probative value of the documents to ascertain the truth was not substantially outweighed by the risk that admission of the document would unfairly or harmfully surprise Conoco. To minimize the harm, the judge recessed the trial for four days to allow Conoco to retrench and prepare for the introduction of the documents.

Conoco was always aware that the plaintiff claimed the dip vat was designed and used as a vapor heat transfer vat. Conoco's experts had the same opportunity to examine the vat as did the plaintiff's experts. Each party's experts gathered information, made assumptions, and reached a conclusion. Plaintiff's experts determined that the vat was designed and used as a vapor heat transfer vat. On the other hand, Conoco's experts reached a different conclusion—they determined that the vat was designed as a liquid phase heat transfer vat. Obviously, either the plaintiff's or Conoco's experts had reached an erroneous conclusion. The discovery of the brochure which stated that the vat was designed as a vapor heat transfer vat determined the answer to that controversy.

The major purpose of the introduction of evidence at trial is to arrive at the truth. To arrive at the truth, evidence may be rejected because:

(1) The evidence is unreliable;

(2) the evidence is not relevant; or

(3) the evidence contravenes some legal policy more important than the determination of truth.

The use of the discovery process has for the most part eliminated surprise and ambush from the trial of civil actions. Full disclosure of all relevant facts gathered or known by the parties is essential to secure a just determination of an action. The brochure was relevant to the issue of how the dip vat was designed to be used—the brochure had great probative value to the determination of that truth.

Under K.S.A. 60-455, the trial judge may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered. We find under the circumstances the trial judge did not abuse his discretion by admitting the evidence.

### STEAM EXPLOSIONS AND THE KETTLE TEST

Conoco's last complaint is that, although plaintiff's experts were permitted to testify that it was impossible for steam to have caused the explosion, it was prevented from demonstrating to the jury the scientific and physical principles that Conoco's experts used in concluding that steam caused the explosion. Conoco sought to present the kettle test by a videotape as demonstrative evidence of its expert's explanation of the scientific principles applicable to steam explosions. The kettle test consisted of a series of experiments performed for Conoco at the independent testing laboratories of Southwest Research Institute under the supervision of Conoco expert Dr. Adams, who specializes in the investigation of combustion and steam explosions and fires, including refinery explosions and asphalt fires.

To justify his refusal to allow the jury to view the videotape of the kettle test, the trial judge stated:

"The 'kettle test' does deserve mention. The court made extensive findings after hearing much evidence about this 'test.' The fact remains there were many significant differences that existed between the kettle 'test' and the structure of the asphalt dip vat at J&J. It would have been prejudicial to admit this evidence even for the 'illustrative purposes' alleged by Conoco."

The trial court excluded the videotapes and an explanation of the kettle test experiment because the test did not replicate or at-

tempt to replicate what occurred in the dip. vat at J & J and was not sufficiently similar to what had occurred in the asphalt dip vat.

Relying on *Robinson v. Audi NSU Auto Union,* 739 F.2d 1481, 1484 (10th Cir. 1984), and *Millers' Nat. Ins. Co., Chicago, Ill. v. Wichita Flour M. Co.,* 257 F.2d 93, 99 (10th Cir. 1958), Conoco argues that where evidence is offered only for the purpose of illustrating scientific principles, the experiment need not be "substantially similar" to the actual events upon which the lawsuit is based.

*Robinson* was a products liability action in which plaintiffs sued the manufacturer, importer, distributor, and retailer of their Audi automobile for damages arising out of a rear-end collision. Defendants offered into evidence over plaintiffs' objection the film "Cars That Crash and Burn," which depicted a series of rear-end collisions between various different makes of 1973 automobiles. Plaintiffs' Audi was a 1976 model. On appeal, plaintiffs contended that the film was inadmissible because it depicted collisions of 1973 automobiles which were dissimilar from the 1976 Audi involved in the accident and because the conditions under which the filmed collisions occurred did not reflect the conditions surrounding the plaintiffs' accident. Plaintiffs also maintained that the defendants' expert should not have been permitted to refer to the inadmissible film in testimony.

In resolving this issue, the Tenth Circuit noted that the admission of evidence of experiments must be established by showing background proof that the experiments were conducted under conditions that were at least similar to those which existed at the time of the accident. Demonstrations of experiments used to merely illustrate the principles in forming an expert opinion do not require strict adherence to the facts. It is important in that situation, however, that it be made clear to the jury that even though there is not similarity to the events of the accident the information is received on a theoretical basis for the limited purpose for which it is offered. Where photographs, films, and slides are used to demonstrate the experiment, care must be used to point out that they are representative only of what the witness is seeking to establish and they must not be misleading in and of themselves. It stated that the purpose of this rule is to prevent

confusion of the jury. Accordingly, when experiments do not simulate the actual events at issue, the jury should be instructed that the evidence is admitted for a limited purpose or purposes. 739 F.2d at 1484. The *Robinson* court found that plaintiffs had waived any objection to the absence of a limiting instruction and that they suffered no prejudice by the admission of the film.

*Millers' Nat.* involved an explosion at a grain elevator. Defendant insurers objected to the admission of motion pictures of experiments conducted by plaintiff's witnesses and to testimony relating to the experiments as misleading because they were not performed under conditions substantially similar to those known to have existed at the time of the occurrence. The court instructed the jury before each group of films was shown that they were admitted only for the purpose of illustrating certain principles which plaintiff contended were applicable in the case. The Tenth Circuit stated that it is clear that the experiments were presented to show principles and not to show what actually occurred. Defense counsel did not contend that an expert may not state the principles on which an opinion is based. Indeed, in a case such as this, expert testimony would be of little value unless such principles were both stated and tested by cross-examination. The demonstrative evidence which was used was merely a means to enable or assist the witness to make an understandable communication of admissible matter with reasonable accuracy and expedition.

The *Millers' Nat.* court noted that the admission of testimony of experiments is a matter resting largely within the discretion of the trial court. The proper exercise of that discretion depends upon the situation in each case. In *Millers' Nat.*, the question was whether the breakout was caused by dead weight loading alone or by such loading plus an explosive force. This involved consideration of pressures, stresses, strains, transmission of force, structural strength, and other matters that are beyond the common knowledge of persons untrained in the subjects. The trial judge, after patiently viewing the pictures out of the presence of the jury, concluded that they were admissible to show the principles which the plaintiff contended. He permitted the defense to perform experiments in the courtroom. He gave proper cau-

tionary instructions. The *Millers' Nat.* court held there was nothing before it to show any abuse of discretion.

In response, plaintiff cites 22 Wright & Graham, Federal Practice and Procedure, Evidence § 5171 (1978), and claims that the question of admissibility of scientific or experimental tests is one of relevance; *viz.,* does the experiment have any tendency to prove or disprove a consequential fact? Plaintiff also argues that for experimental evidence to be probative, the proponent of the evidence must demonstrate that the conditions of the experiment were identical with or similar to those obtained in respect to the litigated happening.

Relying on the following quotation from a case challenging the admission of accident reconstruction evidence, *Spraker v. Lankin,* 218 Kan. 609, 615, 545 P.2d 352 (1976), plaintiff argues that Kansas adheres to the rule that the condition must be similar to such a degree that the results of the experiment are based upon more than speculation:

"We conclude that it was prejudicial error to submit this testimony to the jury. Opinions of experts are helpful to a court or jury in motor vehicle cases, particularly where there are no eyewitnesses to a collision. [Citations omitted.] However, opinions must be based upon reasonably accurate data available at the scene. Where there is little factual data, computations based upon assumption and speculation should not be received in evidence."

Plaintiff's evaluation of the court's conclusion in *Spraker* is not correct. As to the plaintiff's claims that the test vehicles and test conditions were dissimilar to those involved in the collision, the court noted:

"Some of the obvious differences are the grade at the accident scene and the level test site; the different makes, sizes, weights, types and construction of the motorcycles; the types of brakes; the types of tires; and the surface areas of the portions of the various vehicles which came in contact with the surface of the highway." 218 Kan. at 614.

The *Spraker* court concluded that such differences go to the weight of the testimony rather than its competency, citing *Pool v. Day,* 143 Kan. 226, 53 P.2d 912 (1936). The court stated the differences should be recognized and may be explained by the expert. 218 Kan. at 614.

Regarding the admissibility of the kettle test, the trial court here stated:

"Counsel, the admission of evidence is within the sound discretion of this Court. The ruling of this Court on this particular motion is based upon a principle of law that's found in *Timsah v. General Motors Corporation*, 225 Kan. 305. It is the opinion of this Court . . . whether or not [the test] is admissible to this Jury is within the sound discretion of this Court."

"I believe that in order for this to be demonstrated to the Jury, the one seeking its admission must show conditions similar or present at the time of the occurrence in question. The testimony has been quite clear here in this particular case that the results of the kettle test do not attempt nor do they replicate what has occurred in this dip vat at J & J Metals. I believe that if I were to admit the results of this test or evidence concerning this test for even a limited purpose of being illustrative of certain properties or principles, it would be construed and could be—since it's not similar to the conditions, it would be prejudicial to the plaintiffs' case.

"I will therefore, in short, sustain the plaintiffs' motion and direct that it—the videotapes not be shown and that the evidence not be adduced in the form of testimony from the doctor concerning the same."

In *Timsah v. General Motors Corp.*, 225 Kan. 305, 591 P.2d 154 (1979), plaintiffs' truck went out of control, turned over, and remained on its side for some time. Witnesses testified the hydraulic fluid reservoir for the power steering system still contained hydraulic fluid after the accident. Plaintiffs offered to fill the reservoir with water, place the cap thereon, and turn the reservoir on its side in the presence of the jury. The defendant objected to the experiment because there was no offer of proof that the conditions involved in the proposed experiment would be similar to the conditions which were present at the time of the accident. The court refused to permit plaintiffs to conduct an in-court experiment to establish whether the hydraulic reservoir would retain fluid when turned upside down. The *Timsah* court stated that the relevance of demonstrations or tests to be performed in the presence of the jury rests in the sound discretion of the trial court and its decision on the matter would not be reversed on appeal unless an abuse of discretion is apparent. 225 Kan. at 317.

The admission of evidence of experiments must be established by showing background proof that the experiments were conducted under conditions that were at least similar to those which existed at the time of the accident. Demonstrations of experiments used to merely illustrate the principles in forming an expert opinion do not require strict adherence to the facts. The relevance

of demonstrations or tests to be performed in the presence of the jury rests in the sound discretion of the trial court.

Each of the cases cited by the parties concludes that the admission of evidence of experiments is a matter resting largely in the discretion of the trial court. The trial court noted the misleading effect the kettle test would have on the jury, as well as the problem with its relevance to understanding the actual vat. On appellate review, the test is whether the trial court abused its discretion. In this case the court did not abuse its discretion.

Negligence is actionable when it involves the invasion of a legally protected interest, the violation of a right. If recovery is to be had for such negligence, the injured party must show: (1) a causal connection between the duty breached and the injury sustained, and (2) that he or she was damaged by the negligence. Plaintiff has met that burden. In addition, the law does not guarantee to every litigant a perfect trial; it does guarantee each litigant a fair trial. *Schneider v. Washington National Ins. Co.*, 204 Kan. 809, 815, 465 P.2d 932 (1970). We have reviewed Conoco's claims and note the parties were well represented by their attorneys and the trial was presided over by a skilled judge. Conoco received a fair trial.

Because of our decision, we do not reach Carswell's cross-appeal.

Affirmed.

ABBOTT, J., not participating.

JAMES M. MACNISH, JR., district judge, assigned.∎