No. 69,392

STATE OF KANSAS, *Appellee*, v. DONALD WHITAKER, *Appellant*.
(872 P.2d 278)

Opinion filed April 15, 1994.

*Jean K. Gilles Phillips,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with her on the brief for appellant.

*David Lowden,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant appeals his convictions and sèntencing on one count of aggravated robbery, K.S.A. 21-3427, a Class B felony; two counts of kidnapping, K.S.A. 21-3420, Class B felonies; one count of aggravated battery against a law enforcement officer, K.S.A. 21-3415, a Class B felony; and one count of attempted aggravated robbery, K.S.A. 21-3301 and 21-3427, a Class C felony, all of which together resulted in a controlling sentence of 20 years to life. The defendant claims the trial court erred in: (1) erroneously instructing the jury on how a juror is to vote; (2) failing to instruct on robbery as a lesser included offense of aggravated robbery; (3) instructing the jury on the burden of proof necessary to convict; (4) failing to stop prosecutorial misconduct in closing argument; and (5) enhancing his sentence because the judge believed that the defendant gave false testimony.

Donald Whitaker and Aldred Neal were charged with six felonies. The defendants were tried separately.

### The State's Version

Neal and Whitaker abducted Donnell Trotter at gunpoint shortly after midnight on May 10, 1991. Neal informed Trotter they were going to rob him. Whitaker drove them to a stockyard where Trotter was forced into a trailer. Neal threatened to shoot Trotter if he refused to tell where his money was. Trotter then told Neal that he had no money but Ford Carr II, who was a bail bondsman and owned a liquor store, had money at Carr's house. Trotter gave directions to Carr's house and told where the money was located. Neal and Whitaker chained Trotter to the wall of the trailer, taped his mouth shut, and left.

Carr woke about 1:30 a.m. when he heard Neal knocking at his door. Carr let Neal in. Neal asked Carr to post a $10,000 bail bond for a friend. Neal sat down at a table to purportedly count out some money he had in a briefcase. Carr heard a door open and turned to see who was coming in. When Carr turned back towards Neal, he saw Neal holding a large caliber handgun. Neal told Carr it was a holdup. Neal then forced Carr to go to the basement. He told Carr that Trotter claimed there was $20,000

in a briefcase in the basement. Carr stated that if Trotter said that, they should get Trotter to show them where it was.

Neal then forced Carr to drive Neal to meet Whitaker. Whitaker, driving another car, then followed Carr and Neal to a parking lot where Whitaker got out of his car and into Carr's vehicle. As they started to drive away, Whitaker told Carr to stop because Whitaker had forgotten a small caliber handgun in the other car. After Whitaker returned with his pistol, Carr then drove to the trailer where Trotter was confined. Neal and Whitaker told Trotter they were going to take him back to Carr's and the money better be where Trotter claimed it was. Trotter then told Neal that Carr had a substantial amount of money in a safe at Carr's liquor store. Neal and Whitaker unchained Trotter, but left him handcuffed. The four men left in Carr's vehicle with Carr driving. Carr noticed that his car was almost out of gas. Neal told Carr to turn down a certain street, where Whitaker got out of the car to get some money.

When Whitaker returned, Carr drove to a convenience store. As Whitaker began pumping the gas into the car, a police car drove into the parking lot. Trotter attempted to get out of the car. Whitaker and Neal grabbed Trotter. The officer, who was talking to another driver, noticed a struggle between two of the occupants in Carr's vehicle. Trotter opened the door, jumped out of the car, and ran towards the police officer. Neal told Carr to drive next to the officer and then slow down. As the vehicle moved towards the officer, Neal rolled down his window and began yelling for help. Carr stepped on the gas, jumped from the vehicle, and ran. As Carr's vehicle moved towards him, the officer heard the person who he had seen fighting with Trotter calling for help in a "mocking" manner. The officer and Trotter took cover behind a dumpster. As the officer reached for his weapon, he was shot in his right arm.

A security guard at a nearby business heard shots and ran towards the sound. He observed a man run away from the area, and called 911. The guard subsequently noticed Carr's vehicle parked in his employer's lot. A search of Carr's vehicle by the police yielded a .32 caliber automatic pistol similar to the pistol

Whitaker had carried. Keys found on Whitaker after his arrest matched padlocks found at the stockyard where Trotter had been detained.

### The Defendant's Version

Whitaker testified that after he moved to Wichita he lived with Neal's parents for a period of time but moved out the weekend before May 10, 1991. After Neal had picked up Whitaker on May 10, 1991, Neal stopped at some apartments to talk to Trotter. Whitaker heard Neal and Trotter talking about money Trotter owed Neal. Trotter told Neal he had some of the money and "dope" left. Neal and Whitaker left but returned around midnight and again saw Trotter. Neal talked to Trotter. They both returned to Neal's car. Whitaker claimed Neal forced him at gunpoint to assist in taking Trotter to the trailer and chaining Trotter to the trailer's walls.

While Neal went to Carr's house to search for the briefcase full of money, Neal left Whitaker handcuffed to the steering wheel of a car in a convenience store parking lot. When Neal returned he had Carr with him. Neal forced Whitaker to return to the trailer where Trotter was chained. After the four of them left the trailer in Carr's automobile, Carr noticed that the car was low on gas. Neal asked Whitaker if he had any money. Whitaker told Neal he had some money at his house. When they arrived at his house, Whitaker got out of the car to get the money. Once inside the house, Whitaker looked for a gun Neal had given him but could only find the holster, which he clipped onto his belt. Whitaker grabbed a $10 bill and a quarter from the table, then left the apartment to find a phone. He called a friend and told her about the situation. She said she would come over to help Whitaker.

Whitaker returned to the car. Carr then drove them to the convenience store to get gas. As Whitaker was pumping the gas, he saw the police car pull in. Whitaker saw Trotter was trying to escape from the car. Whitaker opened the door and told Neal, "Don't shoot him, don't shoot him." Neal told Trotter if he did not sit back down, he would shoot him. Trotter got out of the car and ran. Whitaker told Carr to drive away. Neal told Carr to

drive slowly towards a dumpster. Neal rolled down his window. Neal then got out of the car and started shooting. Carr got out of the car. While the car was still moving, Whitaker, who was in the back seat, climbed into the front seat and drove away.

Whitaker then went to Neal's parents' house, entered through a back window, and called his friend again. He agreed to meet her. Before he could leave, he heard people outside. Whitaker ran into another bedroom and hid. Officers entered the bedroom, found Whitaker, and arrested him. Whitaker denied having a gun that night.

Before the jury was instructed, defense counsel informed the trial judge that the instructions were the ones requested by the defense. The defense did not object to the instructions. The jury was instructed on criminal liability for aiding or abetting another to commit a crime. The jury began deliberations on Monday, August 19, 1991. At 12:57 p.m. the following Thursday, August 22, 1991, the jury, in writing, asked the judge specific questions about the evidence and to explain certain instructions. At 3:15 p.m. that day, the jury asked the judge in writing to explain the law of "intent"; to clarify "intentionally"; and to clarify "what other crime was reasonably foreseeable, as it applies in these charges." The jury informed the judge: "Our problem is with the aiding and abetting law."

The court replied and gave an additional instruction that read:

"Ordinarily a person intends all of the usual consequences of his voluntary acts. This inference may be considered by you along with all the other evidence in the case. You may accept or reject it in determining whether the State has met its burden to prove the required criminal intent of the defendant. This burden never shifts to the defendant."

The next morning, the entire testimony of the security guard and of the police officer who was shot was read back at the jury's request. Later that day the jury returned its verdict. The jury found Whitaker guilty of the aggravated robbery of Trotter, the kidnapping of Trotter, the kidnapping of Carr, the attempted aggravated robbery of Carr, and the aggravated battery against a law enforcement officer. The jury acquitted Whitaker of the aggravated burglary of Carr's residence. The judge sentenced Whi-

taker for count 1—aggravated robbery, 10 years to life; count 2— kidnapping, 10 years to life; count 4—kidnapping, 10 years to life; count 5—attempted aggravated robbery, 5 to 20 years; and count 6—aggravated battery of a law enforcement officer, 10 years to life. All counts except count 6 were to run concurrent with each other but consecutive to count 6. A controlling sentence of 20 years to life was imposed. Whitaker now appeals.

## *ALLEN* TYPE INSTRUCTION

When addressing departures from the pattern jury instructions, we have noted:

"Kansas has been a leader in the preparation and publication of pattern jury instructions, both civil and criminal, for the assistance and guidance of the bench and bar. The committee on Pattern Jury Instructions of the Kansas District Judges' Association first published pattern jury instructions for use in the trial of civil cases in 1964, and revisions of that original work have been published regularly since then. Similarly, Pattern Criminal Jury Instructions have been prepared by the same committee, serving as an Advisory Committee on Criminal Jury Instructions to the Kansas Judicial Council. Pattern Criminal Jury Instructions were first published in 1971, and these are now published in loose-leaf form and are updated annually. The advisory committee and the Kansas Judicial Council, whose membership includes many distinguished Kansas judges and lawyers, have produced a work of invaluable assistance. Reversals and the necessity of new trials in criminal cases because of error in the jury instructions are now quite rare because of the clarity and correctness, and the widespread use, of the Pattern Criminal Jury Instructions.

"When pattern jury instructions are appropriate, a trial court should use them unless there is some compelling and articulable reason not to do so. A trial court, in the press of a busy trial, cannot possibly do the research and give the thought to each jury instruction that has gone into the preparation of pattern instructions by the advisory committee." *State v. Wilson*, 240 Kan. 606, 609-10, 731 P.2d 306 (1987).

"The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. They should be the starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed." *State v. Pioletti*, 246 Kan. 49, 58-59, 785 P.2d 963 (1990).

Whitaker argues the instruction to keep the jury from becoming deadlocked is clearly erroneous because it departs, without a com-

pelling reason, from the language of the pattern jury instructions. We note that defense counsel had approved the instructions and did not object at trial. No party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds for the objection, unless the instruction is clearly erroneous. K.S.A. 22-3414(3). An instruction is clearly erroneous only if the reviewing court reaches a firm conviction that if the trial error had not occurred there is a real possibility the jury would have returned a different verdict. *State v. Deavers*, 252 Kan. 149, 164-65, 843 P.2d 695 (1992).

The instruction given to the jury states:

"In your deliberations, you should lay aside mere pride of opinion, and should bear in mind that the jury room is no place for espousing and maintaining an advocacy of either side of the case. The aim to be kept in view by the jury is the truth as you find it to be from the evidence, considered with the instructions of the Court.

"It is the duty of the jury to consider the evidence and instructions together, and to listen to the arguments of each other with an open-mindedness and a disposition to be convinced by them. If at any time after such consideration of the evidence and the instructions a juror is convinced that his or her vote is wrong, it then becomes the duty of such juror to change his or her vote."

PIK Crim. 3d 68.12 states:

"This is an important case. If you should fail to reach a decision, the case is left open and undecided. Like all cases, it must be decided sometime. Another trial would be a heavy burden on both sides.

"There is no reason to believe that the case can be tried again any better or more exhaustively than it has been. There is no reason to believe that more evidence or clearer evidence would be produced on behalf of either side.

"Also, there is no reason to believe that the case would ever be submitted to 12 people more intelligent or more impartial or more reasonable than you. Any future jury must be selected in the same manner that you were.

"These matters are mentioned now because some of them may not have been in your thoughts.

"This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision.

"This does mean that you should give respectful consideration to each other's views and talk over any differences of opinion in a spirit of fairness and candor.

If at all possible, you should resolve any differences and come to a common conclusion so that this case may be completed.

"You may be as leisurely in your deliberations as the occasion may require and take all the time you feel necessary."

The challenged instruction and the PIK instruction are similar to the "dynamite" or "*Allen*" instruction. The former appellation is derived from the explosive effect the instruction engenders when given *after* a jury has been deadlocked. The giving of the instruction to a deadlocked jury sometimes immediately results in a verdict. *United States v. Kahaner,* 317 F.2d 459 (2d Cir. 1963). The latter nomenclature memorializes the case in which the United States Supreme Court in 1896 approved the use of this type of instruction. *Allen v. United States,* 164 U.S. 492, 501-02, 41 L. Ed. 528, 17 S. Ct. 154 (1896). The *Allen* Court concluded while undoubtedly the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the juryroom. The very object of the jury system is to secure unanimity by a comparison of views and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of that juror's own judgment, if the juror finds a large majority of the jury taking a different view of the case from what he or she does. It cannot be that each juror should go to the juryroom with a blind determination that the verdict shall represent that juror's opinion of the case at that moment; or that each juror should close his or her ears to the arguments of other jurors who are as equally honest and intelligent as that juror.

A variation of the *Allen* charge is the *Aldisert* charge, which is preferable to the *Allen* charge because it urges each "juror to reflect upon the correctness of his [or her] preliminary appraisal of the evidence, not just the *minority.*" *U.S. v. Smith,* 857 F.2d 682, 684 n.4 (10th Cir. 1988) (Emphasis supplied.). The *Smith* court opined the "point being made" in giving the instruction is "that in case of a hung jury the case would have to be retried unless for some reason it would not be necessary or practicable to retry it." 857 F.2d at 685.

Whitaker contends the instruction given is clearly erroneous because it lacks any command to base the verdict on the "honest judgment and conviction of each individual juror" rather than "upon mere acquiescence for the sake of expediency." Whitaker asserts the use of this instruction prejudiced his Sixth Amendment right to a fair trial and an impartial jury and his right to a unanimous verdict.

The State concedes, "for purpose of argument," the trial judge departed from the recommended PIK instruction but contends the defendant's substantial rights were not prejudiced by the giving of the instruction. It asserts that there is no evidence any juror was coerced to acquiesce for the sake of expediency by the erroneous instruction. The State notes that the instruction was given with the other instructions prior to the start of deliberations, there was no emphasis placed on this particular instruction, and in fact the jury was instructed to not single out any instruction. The State argues that the instruction does not imply or expressly direct that jurors should abandon their honest beliefs.

When reviewing challenges to jury instructions, the instructions are to be considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous. *State v. Walker*, 252 Kan. 279, 295, 845 P.2d 1 (1993).

Instructions containing language similar to the instruction given have been unsuccessfully challenged on appeal in at least two cases. See *State v. Troy*, 215 Kan. 369, 372, 524 P.2d 1121 (1974); *State v. Scruggs*, 206 Kan. 423, 425, 479 P.2d 886 (1971). In *Troy*, the instruction was given after the jury had retired to deliberate and had requested a readback of previous testimony. The *Troy* court noted that the language of the instruction was a variation of PIK Civ. 10.20. The *Troy* court determined that its disapproval of the instruction and its timing did not require reversal. It found that the instruction did not constitute prejudicial error. In addition, in this case, the evidence of guilt is also overwhelming.

Two victims testified Whitaker was armed and actively participated in the crimes. See, *e.g.*, *State v. Poole*, 252 Kan. 108, 115, 843 P.2d 689 (1992) (where evidence is "overwhelming," error in giving *Allen* instruction did not require reversal).

The instruction given does not require that jurors should change their vote or compromise their individual judgments for the sake of reaching an agreement or judicial expediency. The instruction given clearly applies to each member of the jury, not just those jurors espousing a minority opinion during deliberations. The instruction was given to the jury before it retired to deliberate; the instruction was not singled out nor was it emphasized at any point. Whitaker expressed satisfaction with the instructions and consented to the giving of the instruction. Although there are no compelling or articulable reasons to depart from the PIK instruction, Whitaker has not shown his right to a fair trial or a unanimous verdict was prejudiced.

## LESSER INCLUDED OFFENSE INSTRUCTION

Robbery is a lesser included offense of aggravated robbery because all of the elements of the former are included in the latter offense. K.S.A. 21-3107(2)(d); *State v. Fike*, 243 Kan. 365, 368, 757 P.2d 724 (1988). Robbery becomes aggravated when the offender is armed with a dangerous weapon or inflicts bodily harm on anyone during the commission of the robbery. K.S.A. 21-3427.

In cases where the crime charged includes some lesser crime, it is the duty of the trial court to instruct the jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information or indictment and upon the evidence adduced. K.S.A. 21-3107(3). This duty does not arise unless there is evidence supporting the lesser offense. *State v. Patterson*, 243 Kan. 262, 267, 755 P.2d. 551 (1988). Whitaker did not request an instruction on robbery as a lesser included offense of aggravated robbery. Citing *State v. Coleman*, 253 Kan. 335, 856 P.2d 121 (1993), Whitaker notes that the trial judge had a duty to instruct on all lesser included crimes because there was evidence sufficient to support a verdict of guilty of robbery as a lesser included offense.

Whitaker contends that despite both victims' testimony that Whitaker was armed, his testimony that he was unarmed is sufficient to require an instruction on robbery. To support his claim, Whitaker points out the jury had trouble applying the aiding and abetting instruction. Whitaker recognizes that the jury could have found him guilty of aggravated robbery as an aider and abettor of Neal, who was armed. In spite of this, Whitaker claims, without citing authority, this fact does not absolve the trial court of its duty.

Citing *State v. Johnson & Underwood*, 230 Kan. 309, 634 P.2d 1095 (1981), the State counters that the duty to instruct on robbery as a lesser included offense of aggravated robbery does not exist if a weapon was used by one of the participants in the crime. The *Johnson* court noted because the aiding and abetting statute makes criminal liability applicable to both the principal and the one who aids or abets, it is not necessary that both participants to the robbery have a gun to be convicted of aggravated robbery. The *Johnson* court stated in such circumstances it is not necessary to give a lesser included instruction on robbery. 230 Kan. at 311. Here, it is uncontroverted that at least Neal was armed with a gun.

Finally, citing *Coleman*, Whitaker asserts his defense of compulsion did not preclude giving a lesser included offense instruction. Whitaker's reliance on *Coleman* is misplaced. In *Coleman*, there were several different versions of what occurred. Some witnesses testified Coleman fired the fatal shot intentionally, another indicated it was possibly an accident, and Coleman denied firing the gun. In such circumstances, the evidence adduced required an instruction on involuntary manslaughter be given as a lesser included offense to murder.

Here, there were only two versions of what occurred. Whitaker either actively participated in an armed robbery, or he was compelled by the armed robber to participate out of fear for his own safety. If Whitaker's compulsion defense is believed, he is not guilty of a crime. If the compulsion defense is rejected and Trotter and Carr are believed, the only possible verdict is that aggravated robbery occurred with Whitaker acting either as a prin-

cipal or as an aider and abettor to Neal. There was no duty to instruct on the lesser offense of robbery because the evidence clearly shows that a greater offense, aggravated robbery, occurred. *Cf. State v. Mitchell*, 234 Kan. 185, 189-90, 672 P.2d 1 (1983). The trial court was not required to instruct on the lesser included offense of robbery.

## THE BURDEN OF PROOF

When there is reasonable doubt, a defendant "must" be acquitted. K.S.A. 21-3109. The court instructed the jury that if the jury had a reasonable doubt it "should" acquit. Whitaker did not object to the instructions. Under such circumstances, the standard of review is whether the instruction was clearly erroneous. Citing *Sullivan v. Louisiana*, 508 U.S. ___, 124 L. Ed. 2d 182, 113 S. Ct. 2078 (1993), Whitaker claims an error in defining reasonable doubt is clearly erroneous and cannot be harmless error.

In *Sullivan,* the court instructed the jury it had to find guilt beyond a reasonable doubt. The trial court had defined a reasonable doubt in a manner that was "essentially identical" to the definition previously found unconstitutional in *Cage v. Louisiana*, 498 U.S. 39, 112 L. Ed. 2d 339, 111 S. Ct. 328 (1990). 124 L. Ed. 2d at 187. In *Cage,* the jury was told reasonable doubt required a "grave uncertainty," and "an actual substantial doubt" amounting to a "moral certainty." 498 U.S. at 40. The United States Supreme Court held an incorrect instruction on the meaning of "reasonable doubt" cannot be harmless error. It is a " 'structural defect' " in the trial process because its effect on the finding of guilt cannot be quantified or determined. *Sullivan,* 124 L. Ed. 2d at 190-91. The court concluded that the giving of a constitutionally deficient reasonable doubt instruction is a constitutional error that requires reversal of a conviction and is not amenable to the harmless error analysis.

Whitaker also notes that the PIK committee has recently amended this instruction by substituting the word "must" for "should." Whitaker points out that the comments in PIK mention the semantical problem in using "should" versus "must." Whitaker then asserts, in applying the strict construction of penal statutes rule, the words "must" and "should" have clearly distinct mean-

ings; *i.e.*, "should" indicates discretion exists and "must" provides a "strict mandate." Whitaker admits that the challenge he raises has been rejected in *State v. Stuart and Jones*, 223 Kan. 600, 575 P.2d 559 (1978). Whitaker argues that case was wrongly decided and must be reexamined. The State points out that the amendment to the PIK instruction occurred after Whitaker's trial.

The use of "should" as a synonym of "must" in criminal jury instructions was reaffirmed in *Stuart and Jones*, 223 Kan. at 604, which recognized our holdings in *State v. Wilkins*, 215 Kan. 145, 523 P.2d 728 (1974); *State v. Taylor*, 212 Kan. 780, 512 P.2d 449 (1973); and *State v. Connor*, 74 Kan. 898, 87 Pac. 703 (1906). Whitaker claims that *Stuart and Jones* was wrongly decided because it relied on *Connor*, which possibly did not involve a burden of proof instruction. This argument ignores the fact that *Stuart and Jones* also relied on *Wilkins*, 215 Kan. at 155, and *Taylor*, 212 Kan. at 784, which approved the use of the word "should."

We note recently in *State v. Pennington*, 254 Kan. 757, 869 P.2d 624 (1994), this court discussed the use of "should" rather than "must." In *Pennington*, the judge proposed to instruct the jury in accordance with PIK Crim. 3d 52.13: "You should not consider the fact that the defendant did not testify in arriving at your verdict." Pennington objected and requested that "should" be replaced by "must." The judge declined to modify the instruction.. The defendant, citing *Bruno v. United States*, 308 U.S. 287, 84 L. Ed. 257, 60 S. Ct. 198 (1939), claimed the failure to give the instruction as requested was reversible error. The *Pennington* court determined that *Bruno* did not require the "shall" language, but found that the substance of the defendant's requested instruction should have been given.

The *Pennington* court then referred to *State v. Owens*, 248 Kan. 273, 807 P.2d 101 (1991). The *Owens* court had found that the defendant was not prejudiced by the judge's use of PIK Crim. 3d 52.13, which provided "should not" rather than "must not" language could be used when instructing the jury not to consider the fact that the defendant did not testify. In *Owens*, as in this case, the defendant did not object to giving the instruction at trial. The *Owens* court applied the standard of whether the giving of

the instruction was clearly erroneous. The *Pennington* court determined the use of the word "should" provided sufficient direction to the jury but concluded that the use of the term "must" was the better practice.

Although K.S.A. 21-3109 states that where there is a reasonable doubt as to the defendant's guilt, defendant "must" be acquitted, it is not reversible error for the trial judge to instruct a jury: "If you have reasonable doubt as to the truth of any of the claims made by the State, you *should* find the defendant not guilty." The better practice, however, as recognized in the recent amendment to the pattern jury instructions, is to instruct the jury that if there is reasonable doubt, it *"must* find the defendant not guilty." PIK Crim. 3d 52.02.

The State correctly argues that despite the amendment by the PIK committee, *Stuart and Jones* is the law. There was no error in the giving of this instruction. We need not determine whether the rejection of the harmless error analysis in *Sullivan* affects the clearly erroneous standard of review.

## PROSECUTORIAL MISCONDUCT

Defense counsel objected only once during the State's closing argument, to a reference to testimony of a witness. That objection was overruled and is not the subject of Whitaker's appellate challenge. Whitaker recognizes that his attorney failed to object to any other comments made by the prosecutor during closing argument. He contends that even when there is no objection the trial judge has an independent duty to stop the prosecution from making improper comments during closing argument to the jury. The question of prosecutorial misconduct was not raised in Whitaker's motion for a new trial.

Whitaker now, on appeal, for the first time raises his claim that comments by the prosecuting attorney vouching for the complaining witnesses' credibility and casting doubt on Whitaker's veracity when testifying were improper comments. Whitaker asserts that attorneys must confine their remarks to the jury to the evidence adduced. He contends that by commenting on the witnesses' and his credibility, the prosecuting attorney's remarks went beyond the evidence. Whitaker argues that this court should

reverse his convictions because the prosecutor's comments prejudiced his right to a fair trial.

In discussing the inconsistencies in the defendant's testimony, the prosecutor made the following remarks:

"You were lied to during this trial. Somebody sat on that witness stand, took [an] oath to tell the truth, looked at all of you and out and out lied. Was it Trotter and Carr? Well now, let's see. They both told the same story. They didn't have time to concoct it. The police are on the scene like that (indicating) because an officer is shot. And strangely enough all the physical evidence backs up their story. We find the handcuffs, we find the chains, we find the tape, we find Ford Carr's shoes where he has bailed out of the car, and we find the 'phone cover, we find everything. There are 90 some exhibits that all match up with what Trotter and Carr told you happened. Even the defendant admits being there. There [are] a few problems that he couldn't deal with when he testified. Did someone lie? Yeah. He is sitting right there (indicating). You see, the defendant told you — although he had studied the police reports, there was a couple of oops he made while testifying. . . .

"And the empty holster? You've got to love the empty holster. He wants you to believe that he is being threatened somehow by Aldred Neal, although he wasn't afraid, he wasn't scared, he knew he wasn't going to shoot him. But, he was being threatened. He gets away, goes into his house, clips on a holster and then can't find his gun. And he gets back into the car with Aldred Neal who has a gun and who he is afraid of and wants Aldred Neal to see his holster and wonder if he has a gun? Come on. He had the holster because he had the gun. It fits the holster. There is no reason for Aldred Neal to have a .32. That is just a blatant lie. Afraid of him and hides in his house?

"The one thing that he couldn't handle when he testified, the one lie he hadn't prepared, didn't know how to deal with was, there was Marsha Woltman and Lee and Tom York. He couldn't fit it into his story. You know, Mr. York sat there and told you, I am not a hundred percent sure, but that is the guy, the one in the purple shirt standing next to the guy with the briefcase, the guy in the purple shirt doing all the talking that we sent down to Ford Carr's house where they opened a briefcase, pounded on the door and ultimately walked away. He was there and he just wants you just to ignore that. Mysteriously it just couldn't have been him. And he can't tell you who it was. He spends all the time before this happens and all the time after this happens with Aldred Neal, but somehow in this little 15 minute time span someone else dressed like him, looking exactly like him, shows up with Aldred Neal at Ford Carr's house. He can't explain that because he's lying to you. He has sat here and bold face lied to you.
. . . .

"Do you want to put any weight into what a liar tells you on the witness stand throughout his testimony? There are 20 some witnesses, 90 some exhibits, that

also support what Trotter and Carr told you, as well as Officer Don Taylor. And there is no doubt that they planned and jointly committed each and every one of these crimes they are charged with."

No rule governing oral argument is more fundamental than that requiring counsel to confine their remarks to matters in evidence. The stating of facts not in evidence is clearly improper. *State v. Bradford*, 219 Kan. 336, Syl. ¶ 4, 548 P.2d 812 (1976).

The State seeks refuge in the platitude that prosecutors are afforded wide latitude in closing arguments, citing *State v. Carmichael*, 240 Kan. 149, 158, 727 P.2d 918 (1986). The State also argues defendant's failure to object to the comments precludes appellate review. If reviewed, the State claims that the prosecutor's comments were in response to the closing argument of the defense counsel regarding the credibility of its witnesses. Finally, the State claims if there was any error it did not prejudice Whitaker's right to a fair trial and was harmless.

Each case must be scrutinized on its particular facts to determine whether a trial error is harmless error or prejudicial error when viewed in the light of the trial record as a whole, not whether each isolated incident viewed by itself constitutes reversible error. *United States v. Grunberger*, 431 F.2d 1062 (2d Cir. 1970). The court has a duty to stop improper argument "[w]here counsel refers to pertinent facts not before the jury, or appeals to prejudices foreign to the case." *State v. Ruff*, 252 Kan. 625, 635, 847 P.2d 1258 (1993). Before an objectionable statement made by a prosecutor on matters outside the record will entitle the accused to a reversal of his or her conviction, it first must appear that it was injurious to the accused and was likely to affect the jurors to the accused's prejudice. *State v. Ruff*, 252 Kan. at 632. Improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial. Reversible error cannot be predicated upon a complaint of misconduct of counsel during closing argument where no contemporaneous objection is lodged. *State v. Baker*, 249 Kan. 431, 446, 819 P.2d 1173 (1991).

In this case, the comments improperly characterized Whitaker as a liar but did not so prejudice the jury against him as to deny him a fair trial.

## ENHANCING A SENTENCE BECAUSE OF
## FALSE TESTIMONY

At the sentencing hearing, the State requested that the maximum sentence on each count be run consecutively for a controlling sentence of 65 years to life or that in the alternative the court impose a controlling term of 45 years to life. The State also argued the mandatory prison sentence for a crime involving a firearm applied.

The judge stated he had received and reviewed the presentence investigation report and noted the sentencing factors of K.S.A. 21-4606. The judge noted that there was no substantial prior criminal history. The judge observed that there was significant emotional harm suffered by Trotter and Carr. He pointed out that Officer Taylor could have been killed in the gunfire. The judge recognized that although Whitaker was not the person who fired the weapon, injury was a foreseeable consequence of Whitaker's acts. The judge opined, despite Whitaker's assertion of compulsion, that Whitaker intended for Trotter and Carr to suffer emotional harm.

The judge recognized there was conflicting evidence that the motivation behind the kidnapping and robberies was to obtain drugs or money but that even if the drug theory was believed, it was not a mitigating factor. The judge noted that the witnesses' testimony contradicted the defendant's claim he was compelled to assist in the armed robberies and therefore there was no excuse for Whitaker's conduct. After finding the issue of compensation for the victims to be irrelevant to the sentencing factors, the judge stated:

"There is one additional criteria I think is important to consider, even though it's not one of those listed in 4606, that comes out of a Supreme Court case, *State v. May*, found at 227 Kansas, page 393, in which it states that the Court may take into consideration the fact that the defendant took the stand and, swearing under oath, made false statements in his testimony; and that has further been stated to be appropriate consideration by the United States Supreme Court

in *United States v. Grayson,* . . . found at 438 U.S., page 41. I think the Court should be very cautious in taking this into consideration as a criteria and that it should be very clear that the defendant knowingly, willingly, took the stand and committed a fabrication of his testimony. I don't know how much of Mr. Whitaker's testimony might have been fabricated, but I know at least a portion must have been fabricated, because it was just too inconsistent with known facts, and for that reason I think that should be an appropriate consideration the Court may use in arriving at a sentencing in this case."

Whitaker claims the district judge erred in enhancing his sentence on the basis that the trial judge thought the defendant gave false testimony during the trial. A similar issue was raised in a recent Court of Appeals case, *State v. Manzanares,* 19 Kan. App. 2d 214, 866 P.2d 1083 (1994). The sentencing judge in *Manzanares* noted in the journal entry that he had reviewed the factors in K.S.A. 21-4606, that Manzanares had a prior criminal history, and " 'that the Defendant denies culpability for his actions in this matter.' " 19 Kan. App. 2d at 223. On appeal, Manzanares argued it was error for the judge to enhance his sentence based on his testimony at his trial, that he had not intended to run his wife over with his car but had lost control of the vehicle which struck his wife. Two eyewitnesses testified that Manzanares intended to run over the victim.

In affirming Manzanares' sentence, the Court of Appeals relied on *People v. Ward,* 113 Ill. 2d 516, 499 N.E.2d 422 (1986). In *Ward,* the defendant, had steadfastly maintained his innocence. The Illinois court held that the fact a defendant maintains his claim of innocence can be used in setting the sentence where the facts of the case and the evidence indicate the defendant was not truthful. It stated that the apparent "untruthfulness" is a factor in sentencing concerning "the defendant's current condition and attitude towards society." 133 Ill. 2d at 533.

The *Ward* court relied on *United States v. Grayson,* 438 U.S. 41, 57 L. Ed. 2d 582, 98 S. Ct. 2610 (1978), which was cited by the sentencing judge in this case. Grayson was charged with prison escape but testified he left the prison because he was scared he was going to be assaulted by another inmate. This story was not corroborated or supported by any other witness, and the government's rebuttal evidence, as well as cross-examination, con-

tradicted Grayson's version. It was the sentencing court's view that Grayson's testimony " 'was a complete fabrication without the slightest merit whatsoever.' " 438 U.S. at 44. The United States Supreme Court noted: "A defendant's truthfulness or mendacity while testifying on his own behalf, almost without exception, has been deemed probative of his attitudes toward society and prospects for rehabilitation and hence relevant to sentencing." 438 U.S. at 50. It observed that defendants have a right to testify in their own behalf but they do not have a right to testify falsely. 438 U.S. at 54.

The United States Supreme Court did not hold sentences could be automatically enhanced if the defendant's testimony is deemed false. It stated that a sentencing judge has the authority

"to evaluate carefully a defendant's testimony on the stand, determine—with a consciousness of the frailty of human judgment—whether that testimony contained willful and material falsehoods, and, if so, assess in light of all the other knowledge gained about the defendant the meaning of that conduct with respect to his prospects for rehabilitation and restoration to a useful place in society." 438 U.S. at 55.

The *Manzanares* court similarly opined: "A defendant's truthfulness at trial, and its effect on his or her restoration to society, is clearly a part of the evaluation of the defendant's individual characteristics and condition required by Kansas statutes [K.S.A. 21-4601 and 21-4606]." 19 Kan. App. 2d 214, Syl. ¶ 7.

Whitaker argues that the mere belief of the judge that Whitaker lied is insufficient to support a sentence enhancement. He attempts to draw an analogy between the requisite sufficiency of the evidentiary basis for a conviction of perjury, *i.e.*, two witnesses, or one witness and corroborating evidence, to establish falsity of a sworn statement by a witness, see, *e.g.*, *State v. Barker*, 18 Kan. App. 2d 292, 851 P.2d 394 (1993), and the use in sentencing of the fact a defendant lied when testifying at trial. The State counters this analogy was rejected in *State v. May*, 227 Kan. 393, 607 P.2d 72 (1980). The *May* court stated that a defendant has a "right to plead 'not guilty' without chancing an accusation of perjury if the jury convicts." 227 Kan. at 398-99. The *May* court concluded, however, if a defendant takes the stand and lies under oath, the

sentencing judge may consider the falsity of defendant's testimony. 227 Kan. at 399.

The burden of proof required to find without a reasonable doubt that a defendant lied under oath which is required to substantiate a perjury charge, is not the degree of proof required to enhance the sentence of a defendant who falsely testified under oath. There were two witnesses that contradicted Whitaker's testimony that he was unarmed that night. Under *Grayson*, the sentencing judge can carefully evaluate the defendant's trial testimony in determining whether he or she lied. There is a material difference between a determination that perjury occurred, which is a crime that must be proven without a reasonable doubt, and the consideration in sentencing of false testimony. In the latter proceeding, the court may "consider all relevant facts occurring before sentencing." *State v. Hannah*, 248 Kan. 141, 145, 804 P.2d 990 (1991).

The court in this case was aware of the *Grayson* holding in stating:

"I think the Court should be very cautious in taking this into consideration as a criteria and that it should be very clear that the defendant knowingly, willingly, took the stand and committed a fabrication of his testimony."

The court, however, also said, "I don't know how much of Mr. Whitaker's testimony might have been fabricated, but I know at least a portion must have been fabricated, because it was just too inconsistent with known facts."

The sentencing judge's comments show he applied *Grayson*. The problem in applying *Grayson* is not so much whether, and how much, Whitaker lied on the stand. It is whether the sentencing judge *carefully* considered whether the false testimony, in light of other knowledge available to the trial court, affected Whitaker's *capacity for rehabilitation*. Defendants taking the stand in their own defense who clearly lie under oath can have their sentences enhanced if that fact is relevant to the question of the defendants' individual capacity for rehabilitation. The record must show, either expressly or by implication, that the judge who enhances a defendant's sentence because of false testimony

has found the false testimony negatively affects the defendant's capacity for rehabilitation.

It is the sentencing judge alone who determines the appropriate sentence or other disposition of the case. The sentencing judge determines the sentence by exercising his or her best judgment, common sense, and judicial discretion after considering all of the reports, the defendant's background, the facts of the case, and the public safety. A sentence imposed within the statutory guidelines will not be disturbed on appeal if it is within the trial court's discretion and not a result of partiality, prejudice, oppression, or corrupt motive. *State v. McDonald*, 250 Kan. 73, 82, 824 P.2d 941 (1992). In this case, we are unable to determine from the sentencing transcript if the district judge carefully considered, or failed to consider, the impact Whitaker's false testimony had on his capacity for rehabilitation. We must therefore vacate Whitaker's sentences and remand for the district judge to consider the impact of Whitaker's false testimony on his capacity for rehabilitation when resentencing.

We affirm the convictions, vacate the sentences, and remand the case for resentencing in accordance with this opinion.