(40 P.3d 304)
84,772

STATE OF KANSAS, *Appellee*, v. ULYSSES S. WRIGHT, *Appellant*.

Opinion filed January 11, 2002.

*Thomas R. Telthorst*, of Kansas City, for the appellant.

*Terra D. Morehead*, assistant district attorney, *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, for the appellee.

Before BEIER, P.J., PIERRON, J., and WAHL, S.J.

PIERRON, J.: Ulysses S. Wright, appeals his conviction for one count of robbery, a severity level 5 person felony, in violation of K.S.A. 21-3426. Wright argues that improper comments by the prosecutor denied him a fair trial and that his upward departure sentence should be reversed under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). We affirm the conviction and remand for resentencing.

John Cauley is an elderly man who knew Tahmeka Henson for many years prior to the robbery. He said he occasionally gave Henson money and that he referred to her as "Mickey." Cauley testified he was mowing his lawn on the day of the robbery when Henson and Wright pulled up in a red truck. Cauley said Henson asked to use the phone. Cauley got the phone and let Henson use it on the porch while he continued mowing. Cauley said that after awhile Wright got out of the truck and came on the porch with Henson.

After using the phone, Henson asked for a drink of water. Cauley escorted Henson inside while Wright stayed on the porch. Cauley said while they were in the kitchen, Wright came up behind him and bear-hugged him. Wright demanded $300. Cauley said he did not have any money. Wright told Henson to check Cauley's pockets where she found approximately $100. Cauley testified Wright threatened to kill him and then took him to the basement. After

Wright could not find any more money, he told Cauley to stay in the basement until he was gone.

Cauley came out of the basement a few minutes later and telephoned Henson's grandmother to tell her about the robbery. Cauley said he also told his neighbor, Clarence Garrison, about the robbery. It was not until later that day or the next day that he called the police to report the robbery. Cauley identified Henson at trial but said he had not seen her since the robbery and that "it look[ed] like it could be her."

Garrison positively identified Wright and Henson as being at Cauley's house on the day in question. Garrison saw Henson using the phone on the porch while Cauley was mowing his lawn. He testified that after some time, Wright got out of the truck and joined Henson on the porch. He said Cauley later went inside while the two remained on the porch. Garrison went inside his house and did not see anything else concerning the robbery. However, Garrison said Cauley later told him he had been robbed. Garrison picked Wright out of a photo lineup.

Both Wright and Henson took the stand. Henson said she had had a prostitution relationship with Cauley since she was 17 years old. Henson testified that on the day in question, she visited Cauley to borrow money. Cauley agreed to give her money in exchange for posing nude and for giving Cauley oral sex. Henson said Cauley refused to pay her for services and an argument ensued and ended up on Cauley's front porch. After Cauley gave her the money, Henson said Cauley grabbed her buttocks. Henson testified that Wright came to the front porch and saw Cauley grab Henson's buttocks, but he did not participate in the argument.

Wright testified he dropped Henson off at Cauley's house so she could use the phone. He sat in the truck while Henson used the phone inside Cauley's house. Wright said he waited 15 to 25 minutes and then decided to see what was going on. As he got out of the truck, he saw Henson and Cauley on the front porch. Wright said it looked like Henson and Cauley were arguing and then he saw Cauley grab Henson.

Wright testified he walked up on the porch and confronted Cauley. He asked Cauley, "[H]ow you gonna disrespect me by grabbing

Tahmekah on her butt? How you gonna disrespect me by grabbing my woman on her butt?" Wright said he turned to Henson and she said Cauley had propositioned her to have oral sex with him for money. Wright said he was upset, and he told Cauley that he guessed Cauley owed Henson money for grabbing her butt. Wright then returned to his truck. Wright denied entering Cauley's house or robbing him.

On cross-examination, Wright admitted writing a letter to Henson after they were arrested. Part of the letter stated: "Baby, no matter what you hear, I'm going to stick to our story of what went on that day. I wish we could start all over again. Boy have we messed up our lives." Wright testified that by using the word "story," he was describing the events of the day. He also said the comment about messing up their lives was in reference to the fact that he had found out that day that Henson had been exchanging sexual favors for money with Cauley and that had messed up their relationship.

The jury convicted both Wright and Henson of robbery. Wright's classification of 5-F on the nondrug sentencing guidelines grid gave him a presumptive sentencing range of 41-47 months' incarceration. The trial court granted the State's motion for upward durational departure and sentenced Wright to 83 months' incarceration.

Wright argues the State committed reversible error during closing arguments in commenting on the defendants' willingness to lie and by impermissibly bolstering the credibility of Cauley's testimony. Neither of the alleged prejudicial comments were objected to at trial.

Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial. *State v. Sperry*, 267 Kan. 287, 308, 978 P.2d 933 (1999). The court in *State v. Pabst*, 268 Kan. 501, Syl. ¶ 3, 996 P.2d 321 (2000), set forth the following two-part test:

"The analysis of the effect of a prosecutor's allegedly improper remarks in closing argument is a two-step process. First, an appellate court determines whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long

as it is consistent with the evidence adduced. Second, an appellate court must determine whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal."

Wright complains of the following comments by the State during closing argument:

"But obviously there is something at stake for them. Is that enough to make them lie? Is it enough that they would lie for themselves? Is Tahmekah Henson gonna lie to keep Tahmekah Henson out of trouble? And is Ulysses Wright gonna lie to keep Ulysses Wright out of trouble?

"But, better yet, you'll see instruction — or State's Exhibit No. 2 or 3, it's a love letter. Mr. Wright identified it as a letter, but it's filled with, I love you, I hope you're doing fine. I love you with all that is in me. You'll have this back there to read. It's a love letter. They were fiancees. They were getting ready to be married. And what do you do when you go out in trouble — go out and get in trouble? Tahmekah Henson's gonna lie for herself and she's gonna lie for Ulysses Wright. Ulysses Wright's gonna lie for himself and he's gonna lie for Tahmekah. And they thought up this story."

Wright also complains that when defense counsel commented: "Maybe [Cauley's] memory's gone bad, maybe he's having problems remembering the facts," the State stated in rebuttal, "Well, it didn't sound to me like it's faded."

Wright argues the State's comments satisfied both elements of the prosecutorial misconduct test. He contends it was clearly improper for the State to tell the jury the defendants were "gonna lie" and that they "thought up this story." He also contends the State improperly bolstered Cauley's testimony by giving her personal opinion of Cauley's testimony. Wright argues both comments were severely prejudicial and denied him a fair trial. He states the crux of this case was about credibility and the State's comments "tainted the critical jury determination upon which the entire case balanced." He contends the State's personal impression of Cauley's memory bolstered his testimony, while the allegations of lying denigrated his testimony. He suggests the jurors could have returned a not guilty verdict absent the State's comments since they reasonably could have doubted Cauley's memory and veracity.

The State concedes the prosecutor's comments should not have been made. However, in citing *State v. Scott*, 271 Kan. 103, 21

P.3d 516 (2001), the State argues there has been nothing to suggest an "ill will" on the part of the State or that the comments were so gross and flagrant to prejudice the jury against Wright and deny him a fair trial.

Credibility was the key issue in this case. The court in *Pabst* stated: "When a case develops that turns on which of two conflicting stories is true, it may be reasonable to argue, based on evidence, that certain testimony is not believable. However, the ultimate conclusion as to any witness' veracity rests solely with the jury." 268 Kan. at 507.

Under the first prong of the *Pabst* test, we are to determine whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. 268 Kan. 501, Syl. ¶ 3. No rule governing oral argument is more fundamental than that requiring counsel to confine their remarks to matters in evidence. *State v. Bradford*, 219 Kan. 336, Syl. ¶ 4, 548 P.2d 812 (1976). When the prosecutor calls the defendant a liar or vouches for the credibility of a witness, such comment is clearly outside matters in evidence. *Pabst*, 268 Kan. at 506. These types of comments are improper and violative of the Kansas Rules of Professional Conduct and the ABA standards for prosecutors. See KPRC 3.4 (2001 Kan. Ct. R. Annot. 406); ABA Standard 3-5.8(e). The State has conceded this point and further comment is unnecessary.

Not every trial error constitutes reversible error. In examining the second prong of the prosecutorial misconduct test, the court in *Scott* cited the following analysis in determining reversible error:

"(1) whether the misconduct is so gross and flagrant as to deny the accused a fair trial; (2) whether the remarks show ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jury. *State v. Lockhart*, 24 Kan. App. 2d 488, 492, 947 P.2d 461, *rev. denied* 263 Kan. 889 (1997). We must also consider whether the comment was sanctioned by the trial court. See *Pabst*, 268 Kan. at 509 (considering trial court's response to misconduct of prosecutor after objection by defendant); *State v. Zamora*, 247 Kan. 684, 691, 803 P.2d 568 (1990) (considering whether failure to sustain objection and admonish jury prejudiced the defendant's right to a fair trial); *State v. Salter*, 2 Kan. App. 2d 635, 637-39, 586 P.2d 62 (1978) (reversing conviction and ordering

new trial where trial court stated that it was a 'fair conclusion' when prosecutor stated that witness had lied)." 271 Kan. at 115.

Wright does not cite any cases for factual similarity. Rather, he makes the general statement recognizing the issue hinges on our subjective reaction to the prosecutor's improper comments. Wright maintains no one can say with certainty how the jurors would have voted absent the prosecutorial misconduct.

We have examined caselaw on the prejudicial effect of prosecutorial misconduct in closing argument. The present case clearly does not rise to the level of misconduct found in *Pabst*, for example, where the prosecutor called the defendant a liar at least 11 times and attempted to bolster the State's witnesses while also attempting to alter the burden of proof, or as found in *State v. Lockhart*, 24 Kan. App. 2d 488, 492, 947 P.2d 461, *rev. denied* 263 Kan. 889 (1997), where the prosecutor repeatedly called both the defendant and his defense counsel liars, even after the trial court sustained defense counsel's objection.

The comments in the case at bar are similar to those made by the prosecutors in *State v. Whitaker*, 255 Kan. 118, 872 P.2d 278 (1994), and *State v. Eastridge*, 20 Kan. App. 2d 973, 894 P.2d 243 (1995). The comments complained of by Wright do not meet the three factors set forth in *Scott*. Compared to other cases where the defendant is intentionally called a liar or defense counsel's integrity is questioned, there is no evidence of ill will on the part of the prosecutor in the present case. Additionally, the prosecutor's improper remarks were not so gross and flagrant as to prejudice the jury against the accused and deny him a fair trial. See *Whitaker*, 255 Kan. at 134.

After reviewing the record in its entirety and the relevant law, we find the State's comments had little, if any, likelihood of having changed the result of the trial, and we are able to hold such a belief beyond a reasonable doubt. Again, though, it cannot be overstated that a prosecutor's zealousness in arguing a case to the jury should not be given too loose a rein. Drawing reasonable inferences from the evidence is critical to the effective prosecution of a case, but restraint is equally necessary to not inappropriately denigrate op-

posing counsel or inject personal evaluations of the honesty of witnesses.

Wright also argues his upward departure sentence should be reversed based on the United States Supreme Court's decision in *Apprendi*, 530 U.S. 466. We agree based on our Supreme Court's recent decision in *State v. Gould*, 271 Kan. 394, 23 P.3d 801 (2001).

The trial court granted the State's motion for upward durational departure, stating Wright and Henson took advantage of Cauley, an 89-year-old man, that Wright put his hands on and threatened Cauley, and that Wright violated Cauley's personal safety. The trial court's findings of fact and reasons justifying a departure are supported by evidence in the record and constitute substantial and compelling reasons for departure as a matter of law. See K.S.A. 21-4721(d). However, *Gould*, relying on *Apprendi*, stated:

"The notice and jury trial guarantees of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment require that a factual determination resulting in an increase in the maximum prison sentence for an offense beyond the sentence established in the appropriate grid box under K.S.A. 2000 Supp. 21-4704 be made by a jury beyond a reasonable doubt." 271 Kan. 394, Syl. ¶ 2.

The *Gould* court found the Kansas Sentencing Guidelines scheme for imposing upward departure sentences, embodied in K.S.A. 2000 Supp. 21-4716, to be unconstitutional on its face. 271 Kan. 103, Syl. ¶ 3. The holding in *Gould* applies to this case. See *State v. Seibel*, 29 Kan. App. 2d. 489, 28 P.3d 445 (2001). Therefore, Wright must be resentenced.

Conviction affirmed, sentence vacated, and case remanded for resentencing.

BEIER, J., concurring: I write separately because I believe the prosecutorial misconduct in this case raises an extremely close question and highlights our need for additional direction from the Supreme Court on the quality and quantity of misbehavior necessary before we are compelled to find the existence of "ill will."

Although I agree ultimately that the prosecutorial misconduct here does not require reversal, I would not rely, as the majority of the panel does, on *State v. Whitaker*, 255 Kan. 118, 872 P.2d 278 (1994), and *State v. Eastridge*, 20 Kan. App. 2d 973, 894 P.2d 243

(1995). Those decisions predate *State v. Pabst*, 268 Kan. 501, 996 P.2d 321 (2000), and *State v. Lockhart*, 24 Kan. App. 2d 488, 947 P.2d 461, *rev. denied* 263 Kan. 889 (1997), the Court of Appeals opinion dealing with a prosecutor's statements denigrating defense counsel's credibility, on which *Pabst* in part relied. I believe the persuasive value of *Whitaker* and *Eastridge* has been diminished. I instead look to *Pabst* and its two-part standard, the second part of which is further broken down into three factors. *Pabst*—and subsequent cases attempting to employ its revitalized scrutiny of prosecutorial misconduct—control the analysis and outcome here.

As Judge Pierron has noted, *Pabst* counsels us to look first at whether the prosecutor's remarks were outside the considerable latitude allowed in a discussion of the evidence. There can be no serious dispute that the remarks at issue here fall well outside recognized boundaries. *Pabst* then asks us to determine whether the remarks constitute plain error. 268 Kan. at 505.

The second prong of *Pabst* requires us to evaluate whether the conduct was " ' " ' 'so gross and flagrant as to deny the accused a fair trial,' " ' " whether the remarks showed ill will on the prosecutor's part, and whether the evidence against the accused was " ' " 'of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors.' " ' " 268 Kan. at 508 (quoting *Lockhart*, 24 Kan. App. 2d at 492).

The majority panel opinion concludes: "Compared to other cases where the defendant is intentionally called a liar or defense counsel's integrity is questioned, there is no evidence of ill will on the part of the prosecutor in the present case." This is the statement with which I differ. Neither *Pabst* nor the cases following it inevitably require the defendant to demonstrate an instance or instances of spiteful or malicious State conduct beyond the credibility-maligning misconduct underlying the claim. See *State v. Hazley*, 28 Kan. App. 2d 664, 669-70, 19 P.3d 800 (2001) (negative comments about credibility of defense witness met ill will standard; conclusion bolstered by additional improper argument); *State v. Magdaleno*, 28 Kan. App. 2d 429, 437, 17 P.3d 974, *rev. denied* 271 Kan. 1040 (2001) (negative comments about defense counsel's integrity manifest ill will); *State v. Pham*, 27 Kan. App. 2d 996,

1005-06, 10 P.3d 780 (2000) (negative comments about defense counsel reflect ill will; other improper comments reinforce that conclusion). This makes logical as well as legal sense. Although the "ill will" inquiry may be largely an enterprise that relies on individual judges to "know it when they see it," a single impermissible remark or behavior may be so persistent, so extreme, or so unduly prejudicial that it alone demonstrates the existence of ill will. One objectionable comment or behavior repeated and emphasized with impunity is certainly amenable to such a characterization. See *Pabst*, 268 Kan. at 505-12; *Lockhart*, 24 Kan. App. 2d 491-93. In my view, that is exactly what we are faced with in this case.

The prosecutor in Wright's trial did not make an isolated, stray, or accidental remark. Rather, the prosecutor told the jury explicitly that Wright and his fiancee would lie: "Tahmekah Henson's gonna lie for herself and she's gonna lie for Ulysses Wright. Ulysses Wright's gonna lie for himself and he's gonna lie for Tahmekah. And they thought up this story." Unchecked by any defense objection or admonition from the bench, the prosecutor was considerably more direct than prosecutors in other cases subject to reversal have been. See *Hazley*, 28 Kan. App. 2d at 666 (no doubt witness "knew of facts contrary to his testimony"); *Magdaleno*, 28 Kan. App. 2d at 437 (defense counsel "knows . . . that is not true"); *Pham*, 27 Kan. App. 2d at 1005 (defendant and defense counsel do not "care about the truth").

The *Pabst/Lockhart* factor that saves this case from reversal is the third. The weight of the evidence was " ' " 'of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors.' " ' " *Pabst*, 268 Kan. at 508 (quoting *Lockhart*, 24 Kan. App. 2d at 492). Given the elderly victim's testimony, the neighbor's corroboration, and the ambiguity in Wright's letter, the error had little, if any, likelihood of changing the result at trial. We also have not detected other error that could have combined with the prosecutorial misconduct and required reversal under the doctrine of cumulative error. I therefore concur in affirming Wright's conviction.